JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:16-CV-06083-RGK-SK | Date | October 10, 2017 |
|---|---|---|---|
| Title | *Poe v. County of Ventura* | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Sharon L. Williams | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| Not Present | | Not Present |

**Proceedings:** (IN CHAMBERS) Order Re: Defendants' Motion for Summary Judgment or Adjudication of Issues (DE 70)

## I. INTRODUCTION

On November 8, 2016, Dean Poe, Dana Poe, Kyle Poe, Karlee Poe, Kody Poe, Noah Martinez, and David Wirsing (collectively "Plaintiffs") filed a First Amended Complaint ("FAC") against County of Ventura ("County") and several law-enforcement personnel in both their individual and official capacities: Gregory D. Totten, Jeff Barry, Paul Krueger, Ryan Hamlin, Joey De Los Reyes, Robert MacInnes, Chris Borkovec (collectively "Defendants"), and three other persons who have since been dismissed from the case.[1]

The FAC asserts fourteen claims arising from two instances of executing search warrants at the Poe and the Wirsing homes, and two instances of strip searches of Dean Poe ("Poe") and David Wirsing ("Wirsing"): (1) Unreasonable Searches under 42 U.S.C. § 1983, and (2) under California Constitution and statute; (3) Excessive Force and Unreasonable Seizures under 42 U.S.C. § 1983, and (4) under California Constitution and statute; (5) Retaliation Against Protected Speech under 42 U.S.C. § 1983, and (6) under California Constitution; (7) Political Discrimination under 42 U.S.C. § 1983, and (8) under California Constitution; (9) *Monell* Claims under 42 U.S.C. § 1983, and (10) under California statute; (11) Assault; (12) Intentional Infliction of Emotional Distress; (13) Negligent Infliction of Emotional Distress; and (14) False Imprisonment.

Presently before the Court is Defendants' Motion for Summary Judgment or Adjudication of Issues. For the reasons below, the Court **GRANTS** the Motion.

## II. FACTUAL BACKGROUND

This case involves the following facts beyond genuine dispute:

---

[1] In their FAC, Plaintiffs also named Sheriff Geoff Dean, Deputy District Attorney Karen Wold, and Deputy District Attorney Chris Harman. These individuals were dismissed on February 3, 2017, February 8, 2017, and March 7, 2017, respectively. (*See* Docket Entries 53, 57, and 59.)

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:16-CV-06083-RGK-SK | Date | October 10, 2017 |
|---|---|---|---|
| Title | *Poe v. County of Ventura* | | |

### A.  The Parties

Poe resides in Ventura County and is the Vice President of Oil and Gas Sales at Green Compass, the corporate parent of Santa Clara Waste Water Company ("SCWWC"). Dana Poe ("Dana") is Poe's wife; Kyle, Karlee, and Kody Poe are their adult children. At all relevant times, the Poes lived together, and Noah Martinez stayed with the Poes. Wirsing also resides in Ventura County and worked as a transportation manager at Green Compass.

Gregory D. Totten is the Ventura County District Attorney ("VCDA"). Geoff Dean ("Dean") is the Ventura County Sheriff. The remaining Defendants were VCDA investigators.

### B.  The Explosion, and the Reaction

On November 18, 2014, a vacuum tanker truck exploded at SCWWC in Santa Paula. Firefighters responded to the scene. Some of them got injured there. (*See* Statement Uncontroverted Facts ("SUF") ¶ 41, ECF No. 91-1.) Within hours, VCDA[2] began investigating the incident. The investigation revealed that SCWWC management had directed employees to accept hazardous waste without a permit, to store hazardous waste in containers not designed for such materials, and to remove chemical identification labels on the containers to avoid detection. The investigation further revealed that SCWWC employees received little training on handling hazardous chemicals, had inadequate access to safety equipment, and misled the first responders at the scene of the explosion.

Investigator Jeff Barry ("Barry") worked on the case and decided to obtain a search warrant on Wirsing's home. After surveilling the home, drafting a search warrant, putting an execution plan together, and requesting Special Response Team ("SRT") assistance, Barry got more information about Wirsing. (Barry Dep. 89:14–22, Rigali Decl. Ex. 5 at 89, ECF No. 109-5.) On December 15, 2014, district attorney supervising investigator Ralph Martinez told Barry that Wirsing, at a birthday party, said that the firefighters who responded to the explosion faked their injuries; it "was all in their head[s]." (SUF ¶ 41.) Within two days, Barry relayed Wirsing's comment to other investigators. (Statement Genuine Disputes "SGD" ¶ 42, ECF No. 108-1.) He also documented the comment in a memorandum and placed it in the case file on the next day, December 16. Anyone with access to the case file could read it.

### C.  Search of the Wirsing Home

On that same day, December 16, based on VCDA's showing of probable cause, Superior Court Judge Gilbert Romero authorized a sealed search warrant on Wirsing's home. On the next day, VCDA executed the search warrant. VCDA deemed the search low-risk, a level at which it routinely dispatches SRT to execute the warrant. (SUF ¶ 105; *see* SGD ¶ 18.) SRT is part of VCDA Investigator's Office. Its primary missions are to execute low- to medium-risk search warrants and to respond to threats against

---

[2] Hereafter, VCDA refers to the office.

JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:16-CV-06083-RGK-SK | Date | October 10, 2017 |
|---|---|---|---|
| Title | *Poe v. County of Ventura* | | |

VCDA personnel. (SUF ¶ 105.) Dispatched SRT members wear bullet-proof vests and helmets and bring a riot shield, a battering ram, and tactical weapons.

In the early morning of December 17, a fourteen-member SRT, including three Defendants, executed the Wirsing warrant. Each SRT member carried a handgun as customary. (SUF ¶ 21.) Sheila Wirsing answered the door and became alarmed and concerned by the SRT presence. (SGD ¶ 36.) She was allowed to get her six-year-old daughter and they exited the home together. (SUF ¶ 24.) They waited outside the house with Barry while SRT cleared the residence. During their wait, Barry went inside to get a jacket for the daughter, and offered them a choice to wait in the police car to keep warm. When SRT turned over the house to the evidence team for search, the two were allowed to go back in. Then Sheila Wirsing made lunch for her daughter and sent her to school.

Initially away from home, Wirsing came back during the search. Barry interviewed him on the sidewalk after telling Wirsing that he was not under arrest and that he need not answer every question. (Barry Decl. Ex. J 3:12–17, 5:23–6:3, ECF No. 77-9.) During the interview, they talked about the firefighters. Barry told Wirsing that "[y]ou've really got to watch what you say to people because even in the public it doesn't do a service to anyone. I mean, these firefighters had their boots melted. They lit on fire." (Barry Dep. 115:11–15, Rigali Decl. Ex. 5 80.)

From the search, the evidence team recovered documents. It concluded the search by giving Wirsing a notice of search warrant and seized property reports.

### D.  Search of the Poe Home

VCDA continued its investigation into the explosion. Seven months later on July 24, 2015, in a grand-jury proceeding, Poe invoked his Fifth Amendment right against self-incrimination. Two days later, VCDA began surveillance on his home, and Barry drafted a search warrant. On the next day, July 27, Judge Romero authorized a sealed search warrant on Poe's home.

Around 7:30 a.m. on July 31, 2015, VCDA executed the search warrant. VCDA again deemed this search low-risk and dispatched SRT. SRT was equipped with pistols and a pepper ball gun. (*See* SGD Reply "SGDR" ¶ 90, ECF No. 140.) The lead officer carried a riot shield. Before approaching the front door, he put the shield down around the corner, out of view from the door. (*See* Pls.' Ex. 21 ("Poes' video") at 0:00–0:05, ECF No. 123.) He then rang the doorbell once, knocked on the door, stepped back and waited for about 20 seconds, and knocked on the door again. (*Id.* at 0:08–0:36.) The officers did not draw their weapons at this point. (SUF ¶ 68.) After about a minute after the initial knock, Kyle Poe ("Kyle") answered the door. The officers bid him good morning and informed him about the search warrant. (Defs.' Ex. W ("VCDA audio") at 1:03–1:13, ECF No. 87.) Kyle exited as told, wearing only a pair of boxers. (Poes' video at 1:00–1:22.) In the next three and a half minutes, four more adults exited the house while the officers waited outside. (*Id.* at 1:22–5:00.) After finding out that Dana was still inside, the officers asked her — in normal voice — to come out. But she shut her bedroom door

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:16-CV-06083-RGK-SK | Date | October 10, 2017 |
|---|---|---|---|
| Title | *Poe v. County of Ventura* | | |

instead. (VCDA audio at 5:15–6:03.) In response, an officer loudly announced their presence three times. (*Id.* at 6:05–6:35.) And two officers approached the front door holding their guns downward. (Poes' video at 6:40–6:47.) Then one of them released a hand from the gun and waved the bare hand to ask Dana to come out. Within twenty seconds of the final announcement, Dana came out the front door. (*Id.* at 6:35–7:00.) As she exited, the two officers backed up while holding their guns down. (*Id.* at 6:45–7:00.) The last five adults all exited the house in pajamas.

After all residents exited, SRT entry team went inside, cleared the house, and let the evidence team in. Around that time, the officers also allowed the residents to get back in the house to retrieve additional clothing and to use the restroom. Some of them did so. (SUF ¶ 81.) During the actual search, the officers' guns remained holstered. (SUF ¶¶ 78, 86.) One officer held the pepper ball gun, which cannot be holstered. (SGDR ¶ 86.) Martinez left the scene before the search ended at about 9 a.m. Saying "[he] get[s] it" that the officers were trying to do the search as nicely and quickly as they could, Kyle chose to stay (SGDR ¶ 84; VCDA audio 24:09–33.) The other four also returned inside the house. (SUF ¶ 87.) The officers left after giving Dana a notice of search warrant and reports of seized property.

### E.     Strip Searches of Poe and Wirsing

As VCDA continued its investigation, it issued arrest warrants for nine Green Compass or SCWWC employees, including Poe and Wirsing. In response, the company prearranged bail and coordinated the employees' self-surrender.

On August 7, 2015, Poe surrendered to the Ventura County Sheriff's Office ("VCSO"), having arranged to post bail through his criminal defense attorney. (SGD ¶ 33.) VCSO was told beforehand that Poe would post bond. (SGD ¶ P41.) After his surrender, Poe was held in men's booking for over four hours while master booking was in progress — getting notified of his charges, court date, and bail amount. (Woodward Dep. 165:21–24; Rigali Decl. Ex. 11 407, ECF No. 110-1.) During this time, he could have made a call to arrange for bail, or told booking deputies about his prearranged bail. (Woodward Dep. 96:10–14, 98:1–4, 100:4–13, 100:24–101:14, 101:18–21, 102:3–24; Rigali Decl. Ex. 11 377, 379–81.) Due to the jail policy, however, Poe's bondman could not actually post bail until after master booking was completed. (SGDR ¶ 118.) Despite Poe's prearranged bail, and after a bail bondsman delivered his bail paperwork, he was strip searched by unnamed VCSO personnel. This search was conducted, together with his SCWWC colleagues, in plain view of one another. (SGD ¶ P43 and 44; *see also* SGD ¶ 121; SGDR ¶ 121.)

Out of town on August 7, Wirsing arranged to self-surrender four days later. Like Poe, he prearranged bail. (SGD ¶ P35.) VCDA investigator Borkovec knew the arrangement. (SGD ¶ P37.) The booking deputy also knew that Wirsing had a bail bondsman who was ready to post bail. (Patterson Decl. ¶ 10, ECF No. 117.) But like Poe, Wirsing was also strip searched under similar circumstances.

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:16-CV-06083-RGK-SK | Date | October 10, 2017 |
|---|---|---|---|
| Title | *Poe v. County of Ventura* | | |

### III. JUDICIAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a court may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court may grant summary judgment on all or part of the claim, as appropriate. *See id.* Facts are "material" only if dispute about them may affect the outcome of the case under applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.*

To prevail on a summary judgment motion, the movant must show that there are no genuine issues of material fact as to matters on which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Such a showing "must establish beyond controversy every essential element of" the movant's claim or affirmative defense. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (internal quotation marks omitted). On issues that the movant does not have the burden of proof at trial, the movant needs to show only that there is an absence of evidence to support the nonmovant's case. *See Celotex*, 477 U.S. at 325.

To defeat a summary judgment motion after the movant has made an adequate showing, the nonmovant must affirmatively present specific admissible evidence sufficient to create a genuine issue of material fact for trial. *Id.* at 323–24. The evidence need not be in an admissible form. *Id.* at 324. The nonmovant may not merely rely on its pleadings or on conclusory statements. *Id.* Nor may the nonmovant merely attack or discredit the movant's evidence. *See Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983).

In ruling on a summary-judgment motion, the court should accept the nonmovant's evidence as true and draw all justifiable inferences in the nonmovant's favor. *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014). The court may not determine credibility of witnesses or weigh the evidence. *Anderson*, 477 U.S. at 255. The nonmovant's "version of any disputed issue of fact . . . is presumed correct." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). When one party's version of facts is "blatantly contradicted by the record" such as video recording, however, "[the] court should not adopt that version of the facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). To grant summary judgment, the court should find the evidence "so one-sided that [the movant] must prevail as a matter of law." *Anderson*, 477 U.S. at 252.

### IV. DISCUSSION

The Court examines Plaintiffs' claims arising from strip searches and home searches separately.

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:16-CV-06083-RGK-SK | Date | October 10, 2017 |
|---|---|---|---|
| Title | *Poe v. County of Ventura* | | |

**A.   Strip Searches of Poe and Wirsing**

1. *Fourth Amendment Claims (Claims 1 and 3)[3] and Parallel State-Law Claims (Claims 2 and 4)*

Plaintiffs' Claims 1-4, as they pertain to the strip searches, were asserted against Sheriff Geoff Dean and DOES 1-10 only. Plaintiffs failed to timely substitute specific individuals for any of the doe defendants, leaving only Sheriff Dean as a named defendant to these claims. On February 3, 2017, the Court dismissed all claims against Sheriff Dean in both his official and individual capacities. With no named defendants remaining, these claims necessarily fail.

2. *Retaliation and Political-Discrimination Claims (Claims 5 to 8)*

Plaintiffs assert Claims 5 and 6 (federal and state retaliation) against most of the individual defendants. According to the FAC, the defendants engaged in retaliatory conduct due to Wirsing's comments regarding the first responders' response to the accident.

Plaintiffs also assert Claims 7 and 8 (federal and state political retaliation) against most of the individual defendants. Plaintiffs allege that the defendants discriminated against them because of Plaintiffs' positions as SCWW employees, and engaged in retaliatory acts as a result.

With respect to the strip searches, the only individuals who could possibly be implicated are the individuals responsible for the strip searches and Sheriff Dean. As stated above, the Court dismissed all claims against Sheriff Dean in both his official and individual capacities. As to the individuals responsible for the strip searches, none were ever named in this action, or otherwise substituted for doe defendants. Therefore Claims 5-8 also fail.

3. *Monell and Corresponding State Claims (Claims 9 and 10)*

Claims 9 and 10 have been asserted only against the County.

The Civil Rights Act imposes liability on a person who deprives others their "rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. Municipalities and other local governments may be liable under this statute. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). This *Monell* liability "may attach when an employee is acting [in accordance

---

[3] Although the FAC asserts claims 1, 3, and 9 under the Fourth and the Fourteenth Amendments, Plaintiffs' Opposition does not mention the latter anywhere. (*See generally* Pls.' Opp'n, ECF No. 125.) Thus, the Court deems Plaintiffs' Fourteenth Amendment claims waived, except to the extent it extends Plaintiffs' Fourth Amendment claims to state and local actors.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:16-CV-06083-RGK-SK | Date | October 10, 2017 |
|---|---|---|---|
| Title | *Poe v. County of Ventura* | | |

with] an expressly adopted official policy, longstanding practice or custom, or as a final policymaker." *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014).

California Civil Code §52.1 creates a claim against any person who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion," with the constitutional rights of an individual. Cal. Civ. Code §52.1. Some courts have held that *respondeat superior* liability is available for §52.1 claims against a governmental entity pursuant to Cal. Gov't Code §815.2(a). *See, e.g., Warner v. County of San Diego,* 2011 U.S. Dist. LEXIS 14312, at * 12–13 (S.D. Cal. Feb. 14, 2011); *Ohlsen v. County of San Joaquin*, 2008 WL 2331996, at *5 (E.D. Cal. June 4, 2008).

For both the federal and state claims, liability against the County cannot attach unless there is a constitutional violation in the first place. And even if a constitutional violation is established, the *Monell* liability still cannot attach unless the violation was performed in accordance with an official policy, procedure, practice or custom adopted by the County. As discussed below, Plaintiffs have failed to raise a triable issue as to either a constitutional violation or an unconstitutional policy or procedure.

    a.    No Triable Issue Regarding a Constitutional Violation

Under the Fourth Amendment, whether a search or use of force is reasonable is "predominantly an objective inquiry." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011); *Graham v. Connor*, 490 U.S. 386, 397 (1989). The officer's subjective intent does not matter. *Id.* The inquiry turns on case-specific facts, including: "(1) the scope of the particular intrusion, (2) the manner in which it is conducted, (3) the justification for initiating it, and (4) the place in which it is conducted." *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011) (internal quotation marks omitted). The same analysis applies to reasonableness under the California Constitution.

This case-specific approach also applies to jail strip searches. The Ninth Circuit has stated that the sheer number of prisoner intakes and the need to maintain security justify suspicionless visual body-cavity searches. *United States v. Fowlkes*, 804 F.3d 954, 961 (9th Cir. 2015) (citing *Bull v. City and Cnty. of San Francisco*, 595 F.3d 964, 968–69 (9th Cir. 2010) (en banc)). Strip searches in a group setting in view of other inmates is not per se unconstitutional. *Mays v. Springborn*, 575 F.3d 643, 649–50 (7th Cir. 2009). On the other hand, "[t]he intrusiveness of a body-cavity search," however, "cannot be overstated. Strip searches involving the visual exploration of body cavities is dehumanizing and humiliating." *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 711 (9th Cir. 1989) (as amended), *overruled on other grounds by Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir.1993).

Here, Plaintiffs' claims appear to stem only from the fact that they were subjected to visual body cavity searches in a communal setting. As stated in *Mays*, however, this is not per se unconstitutional. To establish a constitutional violation, Plaintiffs must show facts indicating that either the manner in which the searches were conducted, or the setting in which they were done were unjustifiable. Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:16-CV-06083-RGK-SK | Date | October 10, 2017 |
|---|---|---|---|
| Title | *Poe v. County of Ventura* | | |

have offered no evidence to that end. Therefore, the Court finds no triable issue of material fact regarding a constitutional violation. Without a constitutional violation, Plaintiffs' *Monell* and §52.1 claims against the County necessarily fail.

          b.        No Triable Issue Regarding an Unconstitutional Policy or Procedure

Even if Plaintiffs could establish a constitutional violation arising from the strip searches, Plaintiffs have not raised a triable issue regarding the County's relevant policies or procedures.

In the prison context, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).The County policy subjects inmates who are assigned housing to a strip search. This is to ensure the safety of inmates and personnel by preventing contraband from entering the jail. (SUF ¶ 115.) As previously mentioned, the Ninth Circuit has stated that the need to maintain security justifies suspicionless visual body-cavity searches. *United States v. Fowlkes*, 804 F.3d at 961. Plaintiffs do not contest the strip search policy per se, but argue that the policy is unconstitutional to the extent it does not prevent all inmates who will make bail, like Poe and Wirsing, from being strip searched. As Plaintiffs point out, courts have distinguished between strip searches conducted on detainees awaiting bail, and searches conducted on inmates admitted or about to be admitted to the general jail population. *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1448 (9th Cir. 1991).

According to the evidence, the County jail's policy controls certain aspects of inmate strip searches. After an inmate enters the jail, a deputy sheriff at a classification desk determines whether he is eligible for an own-recognizance release. (SGD ¶ 112.) For an ineligible inmate, the jail policy requires that the deputy ask him whether he will make bail. (Woodward Dep. 84:2–13, Rigali Decl. Ex. 11 370.) The jail policy further requires the deputy to place the inmate in the bail holding cell "[i]f the likelihood of making bail exists." (Woodward Dep. 84:23–85:6, Rigali Decl. Ex. 11 370–71.) Those inmates who are ineligible for own-recognizance release and have no bail arrangement are assigned housing. (*See* SGD ¶ 112; SUF ¶ 116.) After given a reasonable amount of time to post bail, most of them are released into the general jail population, unless they have a special classification requiring isolation. (Woodward Dep. 128:2–5, Rigali Decl. Ex. 11 396; SUF ¶ 112.) All inmates with assigned housing who are released to the general jail population — except those who can make bail before getting moved to the shower area where strip search takes place — are subject to a strip search to keep weapons and contrabands out. (SUF ¶¶ 111, 114–15; SGD ¶ 111, 114.) Because housing assignments occurs before master booking, inmates do not have a chance to post bail before assignment is made. (SGD ¶ 112.) But if an inmate arranges bail before surrendering *and* informs the booking deputy of this fact, the inmate should be placed in a holding celling awaiting release instead of getting moved for strip search. (SUF ¶ 116.) In sum, a deputy sheriff has the authority to strip search any inmates who are not eligible for release on their own recognizance and who have not told the sheriff that they prearranged bail. (*See* SGD ¶ P49.)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:16-CV-06083-RGK-SK | Date | October 10, 2017 |
|---|---|---|---|
| Title | *Poe v. County of Ventura* | | |

Upon review of this evidence, the Court finds no indication that conforming to these policies leads to violations of an inmate's constitutional rights.

In opposition, Plaintiffs set forth evidence that both Poe and Wirsing had arranged for bail prior to surrendering. However, because housing assignments are made before master booking is complete, inmates do not have a chance to post bail before housing assignments are made. (SGD ¶112.) Plaintiffs' evidence further shows that the booking deputies knew that Wirsing, at least, had a bail bondsman who was ready to post bail. (Patterson Decl. ¶ 10.) Nonetheless, Poe and Wirsing were both subject to strip searches. Finally, Plaintiffs introduce evidence that (1) deputies do not consistently ask inmates about bail, and the County has no policy requiring a final check on an inmate's housing status right before conducting a strip search (Woodward Dep. 133:9–22, Rigali Decl. Ex. 11 399); and (2) the deputies are allowed to determine what constitutes a reasonable length of time to post bond, before subjecting an inmate to a strip search (Woodward Dep. 128:2–5, Rigali Decl. Ex. 11 396; SUF ¶ 112).

Upon review of the evidence, the Court finds no triable issue with respect to the County's policies and procedures. While it appears that inmates cannot post bail before housing assignment are made, the policy provides that inmates are not assigned to housing and thus strip searched, as long there is a likelihood of posting bail or the deputies know that arrangement for bail has been made. Plaintiffs' evidence shows that deputies do not consistently ask inmates about bail. Plaintiffs' evidence also shows that even when a booking deputy knows that an inmate is ready to post bail, the inmate can still be strip searched, as evidenced in Wirsing's case. These facts, however, show only that there are deputies who have violated County policies. The evidence does *not* show that the policy itself is unconstitutional. Finally, Plaintiffs point to "deficiencies" in the policies regarding a final check on inmate housing prior to a strip search and too much discretion in determining a reasonable time to post bail. While addressing these deficiencies would likely improve the system and possibly spare a greater number of inmates from being subjected to strip searches, the Fourth Amendment does not demand a perfect set of policies and procedures. It only seeks to eliminate unconstitutional ones. An imperfect policy that could stand improvement does not equate to an unconstitutional policy. Here, Plaintiffs have not introduced any evidence showing that adherence to the County's policies and procedures results in a violation of the inmates' rights under the Fourth Amendment.

Thus, the Court finds in favor of Defendants on the *Monell* and corresponding state claims.

    4.    <u>*Tort Claims (Claims 11 to 14)*</u>

Plaintiffs' tort claims also all fail. If anyone committed a tortious act related to Poe's and Wirsing's strip searches, it would be a Ventura County sheriff deputy. However, there are no such deputies named as defendants in this action. Ventura County is named. But Plaintiffs assert no vicarious-liability or respondeat-superior claim and make no argument that they apply. Thus, Plaintiffs' tort claims fail to survive summary judgment.

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:16-CV-06083-RGK-SK | Date | October 10, 2017 |
|---|---|---|---|
| Title | *Poe v. County of Ventura* | | |

### B. Searches of Wirsing's and Poe's Homes

Plaintiffs do not contest that probable cause supported the search warrants. Thus, claims 1 and 2 against unreasonable searches have no factual basis. Plaintiffs' allegations of misconduct in the search of Wirsing's and Poe's homes are based on SRT's show of force, including the number of personnel, their equipment, and their behavior. Alleged misbehavior includes officers pointing guns in Dana's and others' faces, officers forcing Dana out of bed, and Kyle believing he was not free to leave. (*See, e.g.*, SGD ¶¶ 63, 64, 84.) But the record contradicts Plaintiffs' evidence. In particular, the audio and video recordings show that SRT members did not point their guns at any residents and did not detain them. The Court adopts, as it should under *Scott*, the version of facts in the recordings. 550 U.S. at 380. Having reviewed the evidence, the Court is satisfied that SRT officers acted reasonably.

Because Claims 3-14 require some misconduct, in its absence, they all fail as a matter of law. Thus, the Court finds in favor of Defendants on all claims arising from the house searches.

## V. EVIDENTIARY OBJECTIONS

To the extent the parties object to any evidence that the Court relies on in this Order, those objections are overruled.

## VI. CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendants' Motion.

**IT IS SO ORDERED.**

           : 

Initials of Preparer